ROBERT A. BORIES, INC., Respondent, v. WESTINGHOUSE BROADCASTING COMPANY, INC., et al., Appellants-Respondents.

First Department, April 2, 1968.

*Allen F. Maulsby* of counsel (*Edwin A. Kilburn* with him on the brief; *Cravath, Swaine & Moore,* attorneys), for Westinghouse Broadcasting Company, Inc., appellant-respondent.

*David Halperin* of counsel (*Fried, Beck & Tannenbaum,* attorneys), for Gotham Broadcasting Corp., appellant-respondent.

*I. Louis Winokur* of counsel (*Frank R. Cohen* with him on the brief; *Farber, Cohen & Diamond,* attorneys), for respondent.

RABIN, J. This controversy arises out of an agreement entered into on July 26, 1961 between plaintiff, Robert A. Bories, Inc.,

(hereinafter referred to as Bories) and Gotham Broadcasting Corp. (hereinafter referred to as Gotham), the then owner and operator of Radio Station WINS, in New York City. Under that agreement, Gotham was to provide certain free radio time to specifically named supermarket chains in exchange for which those chains agreed to provide a certain number of displays, and to otherwise promote the products of various purchasers of advertising time from the radio station. Pursuant to the agreement, Bories was to receive 15% (subsequently reduced to 10%) of the net moneys received by Gotham from the sponsors.

Among other things, the agreement provided as follows: " The term of this agreement shall commence on July 31, 1961, and shall continue for a period of 52 consecutive weeks. In the event that sales to sponsors via this plan equals the average of a minimum, of $7500. worth of radio time per week based on the prices set forth in our Station Rate Card, during the 52-week term of this contract, then this contract shall be automatically extended for an additional period of 52 consecutive weeks. At the termination of this agreement, all contracts for time and merchandising entered into with sponsors through the merchandising plan herein set forth shall nevertheless be continued until the completion of the contracts then in force and commissions shall be payable thereon as set forth herein."

The paramount issue is whether the contract was renewed for a period of one year, pursuant to the above-quoted renewal clause.

During the period of this agreement, Gotham entered into negotiations with defendant Westinghouse Broadcasting Co., Inc., (hereinafter referred to as Westinghouse) for the sale of the radio station. The negotiations culminated in the purchase by Westinghouse of WINS on July 27, 1962. Under the contract of sale Westinghouse agreed to assume various existing contracts of Gotham, which were listed in an attached schedule. However, the Bories agreement was not included in that schedule.

Despite the fact that the Bories contract was not in the schedule of contracts taken over by Westinghouse, Bories did continue with WINS after Westinghouse took over the station. The basis for such continuance is in dispute. The plaintiff claims that its employment was pursuant to the contract of July 26, 1961, which it claims was continued for another year, that is, through July 31, 1963, it having complied with the conditions to make the automatic renewal clause effective. While it is conceded that there was no express assumption of this contract by Westinghouse, the plaintiff claims that Westinghouse, through its conduct assumed the obligation of that contract.

Westinghouse on the other hand asserts that Bories continued its relationship with the station, not pursuant to any extension of the Gotham contract, but under a new contract terminable at will upon the giving of 30 days' notice. Westinghouse did notify the plaintiff that it wished to terminate its arrangement effective September 30, 1962, and on that date the relationship was terminated. The plaintiff claims that the termination by Westinghouse was wrongful because Westinghouse assumed the contract and, pursuant to its automatic renewal clause, it had been continued for another year. Plaintiff, in the first two causes of action, sues for commissions for the period of October 1, 1962 to July 31, 1963.

Bories' first cause of action is against Westinghouse, based upon its claim of the wrongful termination of the 1961 contract. The second cause of action is against Gotham, the plaintiff claiming that Gotham was still bound under that contract. The trial court found in favor of the plaintiff against both defendants on these causes of action. It also found in favor of Westinghouse on its cross claim against Gotham " on account of any judgment that the latter [Westinghouse] may be obliged to pay on the aforementioned first cause of action."

We will first consider the issues raised with respect to the above-mentioned first and second causes of action, reserving for later consideration the other causes of action and cross claims here involved.

Of course, in order for the plaintiff to recover against Gotham or Westinghouse on its first and second causes of action, the plaintiff must prove that the contract automatically renewed for the second year period. Implicit in the finding of the court in favor of the plaintiff against both of these defendants is a finding that the contract had been renewed.

We conclude that such finding is against the weight of the evidence, and that the agreement of July 26, 1961 terminated on the 31st day of July, 1962 because of the plaintiff's failure to meet the conditions prescribed for an automatic renewal.

As indicated, the contract would be automatically extended for an additional period of 52 weeks " in the event that [during the first 52-week term of the contract] sales to sponsors * * * equals the average of a minimum of $7500. worth of radio time per week ". " Sales " is the crucial word that needs construction. The plaintiff contends that a sale takes place within the meaning of the word " sales " when a sponsor merely enters into the contractual arrangement with the radio station. On the other hand, Westinghouse and Gotham contend that the use of the word " sales " in the radio business refers to " that phase of

the transaction between sponsor and the radio station when * * * the station has caused the time to be broadcast thereby entitling it to bill the sponsor, to wit, the consummated sale or billing stage.'' In other words, the defendants contend that sales means billings. All parties agree that if the defendants' version of the definition of '' sales '' prevails, the plaintiff did not produce sufficient to effect an automatic renewal of the contract.

It is on this issue that we find that the record overwhelmingly supports the defendants' contention. The finding to the contrary is clearly against the weight of evidence.

In a sales transaction there is a distinction between the contract of sale and the consummated aspect of that transaction, which could be considered as the sale itself. It could be said that ordinarily the actual consummation of the contract to sell constitutes the sale. It is urged by the defendants, that in the radio business, it is only then, i.e., when the time contracted for was delivered and the transaction is ready for billing that the transaction is considered a sale. Whether that position of the defendants be correct, or whether the plaintiff's claim that the word '' sales '' refers to contracts of sale, cannot be determined solely by reference to the word as used in the contract. Consequently, in construing the meaning of the word, we must determine what the parties intended.

The only evidence to support plaintiff's contention is the testimony of its principal, Robert A. Bories, given at the trial, to the effect that it was his '' understanding '' with Mr. Ted Steele (former general manager of WINS, and the negotiator of the contract under consideration) that '' sales '' means orders on the books, i.e., contracts to sell time.

Mr. Bories' attempted support of that '' understanding '' testimony — the only testimony in the entire case in support of the plaintiff's position — by a purported conversation with Mr. Steele. We find his attempt in that direction to be equivocal and directly contradictory of his other testimony and cannot be given credence.

How does that testimony stand up in the light of what he testified to upon his examination before trial? That examination presents a quite different but much clearer picture of his '' understanding.'' In explaining a letter written to Mr. Anderson (Mr. Steele's predecessor), as a proposal prior to the signing of the contract, he said: '' I would estimate that we can bring to this station between $10,000 and $20,000 worth of very important weekly business.'' At the trial the witness denied that the word '' business '' referred to billings. However, in his examination before trial we have the following:

"Q. Were you referring there to weekly billings? A. That is right.

"Q. To weekly billings. A. Yes.

"Q. Less commission, or—A. Weekly billings, less commission.

"Q. You were referring to gross billings? A. Yes.

"Q. That there would be $10,000 to $20,000 of gross billings each week? A. We hoped to get."

It was explained during the trial that while he hoped to get $10,000 to $20,000 worth of billings per week, the figure of $7,500 worth of sales was inserted in the contract because it could not be expected that he would start with $10,000 to $20,000 worth of billings, but that the volume would grow as time went on. It was for that reason that the phrase "average * * * per week" was used in the crucial clause of the contract.

Let us examine his testimony before trial, further. As indicated, at the trial he tried to buttress his "understanding" by testifying to a conversation he had with Mr. Steele, in which he referred to sales as orders entered on the books. To the contrary is his testimony before trial. There he insisted that his talk with Mr. Steele concerned billings and that there was no talk with Steele about contracts entered into as distinguished from buildings. The following is a quote from that phase of his testimony:

"Q. Did you talk with Mr. Steele along these lines before the contract was signed? A. I never talked to him about that kind of billing, meaning $10,000 to $20,000, because I knew that from the billing that was on there already, I knew that. I made no pretext—I told him maybe we can go $10,000 or $15,000, but I would guarantee $7,500.

"Q. Of weekly billings? A. Yes. * * * No. I just figured out the accounts that I knew I could bring over that I had talked to, that if I went over to WINS they would go along with me. That is where I arrived at the minimum figure.

"Q. That, again, is weekly billings? A. That is correct."

"Q. And you felt you could do your $7,500 a week billing? A. That is correct.

"Q. And that was the representation that you made to Mr. Steele; is that correct? A. That is right."

What further is needed to determine what the parties meant when they used the word "sales" in their agreement? Mr. Bories' explanation in that respect, given in the examination before trial, is clear and unequivocal. Not only did he state, but he insisted that the $7,500 per week referred to billings. Notably, there is no attempt made by Mr. Bories during the trial to explain away that revealing testimony. Nor was the variance in

his testimony between that given at the examination before trial and at the trial ever adequately explained by the plaintiff. Not only was there no appreciable explanation given at the trial, but there is no satisfactory explanation now advanced.

The defendants' case with respect to what the parties intended in the use of the word '' sales '', could very well rest on the pre-trial statements made by Mr. Bories, himself. However, the record furnishes additional support for their position.

The defendants offered expert testimony which points up the distinction between a sales order and a sale, as those terms are used in the radio business. That testimony was to the effect that a transaction does not become a sale until the station '' follows through and completes [the] particular announcement con-tracted for. That would constitute a sale.'' It is interesting to note that there was no offsetting testimony.

However, support for the expert testimony is found in the fact that the contracts for radio time, offered as exhibits, show that they permit of cancellation by the sponsors. Indeed, there is indication in the record that Bories knew that the contracts were cancelable. Thus, the nature of the transactions points to acceptance of the defendants' testimony with respect to the meaning of the word '' sales '' when used in the radio business. Further support for that position is the fact that the Bories contract did not provide for payment of commissions to the plaintiff upon obtaining an order of sale, but that he was to receive such commissions only after the program contracted for had been presented — in other words not until after it was ready for billing. We must conclude that the weight of testimony sup-ports a finding that, in the radio business, the word '' sales '', when used, refers to the consummated transaction, i.e., when the orders are ready for billing. The plaintiff being in the radio business must be charged with awareness of that custom and, consequently, that must be taken into consideration in deter-mining the intent of the parties in the use of the word '' sales.''

Moreover, support of the strongest nature for the defendants' position that the quota to be met must be in terms of billings rather than contracts of sales can be found in the concession of the attorney for the plaintiff, given at the trial, to the effect that contracts properly cancelled prior to July 31, 1962 (the ter-mination date of the contract) would not be considered toward the required minimum. What of contracts not yet ready for billing that could be cancelled after July 31, 1962 — the termina-tion date? It is of that date that renewal had to be determined. The number of sales obtained could not be changed retroactively. It must follow then, looking at it realistically and logically, that

the parties were referring to actual billings during the contract period. In the context of the transactions involved only the billings figure may be used as of the renewal date to determine whether the automatic renewal clause became effective.

Additional evidence supporting the defendants' position can be found in the acts and conduct of the plaintiff. In order for the contract to automatically renew there had to be $390,000 worth of " sales ". It seems that as of May 8, sales contracts (as distinguished from billings) in excess of that amount, i.e., in the amount of $408,879.80 had been booked. Accordingly, if the plaintiff's version be accepted, the contract would be deemed to have been automatically renewed at that time. It is indeed strange that the plaintiff did not call the attention of anybody in Gotham to the fact that he had reached his goal. His testimony was that he was not aware of that fact until June or July of 1962. Considering its importance to him, it is hardly likely that he did not know the score at that point. This is particularly so since the impending sale to Westinghouse was not only a matter of public knowledge, but admittedly was known to the plaintiff. The only conclusion we can reach is that he did not consider the contract automatically renewed in May, knowing that it was billings that counted and not orders.

The plaintiff points to the continuance of its services by Westinghouse after the take-over as an indication that the contract was automatically renewed. That would not necessarily follow, particularly if we accept the assertion by Westinghouse that the continued service was pursuant to a new oral agreement terminating on December 31, 1962, subject, however, to 30 days' notice of cancellation. In this respect we give the testimony of Westinghouse credence, because Mr. Bories admitted that prior to the take-over, in discussing the proposed relationship between the plaintiff and Westinghouse, he insisted that provision be made for 30 days' notice to be given to him of the intention to terminate their arrangement so as to give him an opportunity to take his business elsewhere. Moreover, he admitted that such provision was actually made.

Why the plaintiff should agree to a 30-day cancellation notice, when at the time of that conversation he was of the belief that his contract had automatically been renewed for a period of a year without any provision for cancellation, is not understandable. It points to the fact that Bories knew that his contract had not been renewed, and it demonstrates that he deemed it necessary to negotiate a new contract in order to continue his relationship with the station. Moreover, the discussion of a 30-day

cancellation provision points to a new arrangement between the parties, rather than a renewal of the Gotham contract.

Even if we were to conclude that the contract was renewed, we cannot hold Westinghouse liable under it unless we found an assumption by it of that contract. We find no such assumption, express or implied. While there is evidence that tends to show that Westinghouse, prior to the take-over, was aware of the existence of this contract, there is insufficient to charge Westinghouse with knowledge that the Bories' contract contained the renewal clause—much less that the condition for the automatic renewal of the contract had been met. The copy of the contract between Bories and Gotham, sent to Westinghouse prior to the closing, and which was admitted in evidence, indicates that the renewal feature had been stricken.

One other aspect of the plaintiff's claim against Westinghouse on the first cause of action needs mentioning. Throughout the proceedings, plaintiff in a rather oblique fashion made reference to the restrictive covenant in the July 1961 agreement. Plaintiff appears to be asserting that Westinghouse is bound by that clause and has violated it by continuing merchandising. We need not consider whether there is any merit to that claim, because this suit against Westinghouse is not in any way brought for the violation of the restrictive covenant.

In view of the foregoing we must find that judgment in favor of the plaintiff against Westinghouse and Gotham on the first and second causes of action should not have been granted and that those causes of action should be dismissed. More specifically, we find

(1) That the word " sales ", as used in the Bories contract was not intended to mean contracts of sales, but rather was intended to mean consummated sales, i.e., when the transaction was ready for billing.

(2) That during the 52-week term of the agreement, the plaintiff failed to show that sales to sponsors averaged a minimum of $7500. per week.

(3) That the contract of July 26, 1961 was not automatically renewed for an additional year.

(4) That there was no assumption by Westinghouse, either express or implied, of the contract of July 26, 1961.

The complaint against Westinghouse on the first cause of action having been dismissed, the corresponding cross claim by Westinghouse against Gotham must likewise be dismissed.

The plaintiff in its third cause of action against Gotham, seeks recovery in *quantum meruit* for work, labor and services in connection with the procurement by the plaintiff of advertisers

who purchased radio time from the defendant Gotham. This claim is not related to the advertising purchased pursuant to the merchandising agreement of July 26, 1961. The proof supports the plaintiff's claim and, consequently, we affirm that part of the judgment which granted relief on this cause of action.

We now consider the cross claim of Westinghouse against Gotham, wherein it seeks recovery from Gotham for commissions that it (Westinghouse) paid Bories. It is claimed that those commissions were paid by mistake and that Gotham was properly liable for them. The court found for Gotham. We agree and affirm that finding.

With respect to that cross claim the court found as follows: "No competent proof was adduced to the effect either that the commissioners accrued on such contracts prior to the sale of the station, or that the usual custom and practice regarding commissions were not followed." That finding is amply supported in view of the testimony that commissions accrued only upon billing, and it seems that the contracts became ready for billing after Westinghouse took over.

There remains for consideration one further cross claim of Westinghouse against Gotham, and that is for the moneys expended by Westinghouse for counsel fees and disbursements in the defense of the first cause of action asserted by Bories against it on the contract of July 26, 1961. Trial Term found in favor of Westinghouse on this claim for counsel fees.

Westinghouse presents three grounds in support of this cross claim.

FIRST: It asserts that Gotham negligently misstated that there was or would be no renewal of the Bories' contract. That ground is untenable because we find, as a fact, that there was no such renewal and, therefore, we may not class such statement — if indeed it were made — to have been negligently or erroneously made.

SECOND: That by failing to list the Bories' contract in the schedule annexed to the contract of sale there was a breach on Gotham's part of its representation and warranty to the effect "that all contracts * * * relating to the present or future operations of Stations * * * are listed and accurately summarized in Exhibit C". It should be noted that Westinghouse was aware of the outstanding contract with Bories, and Gotham agreed to hold Westinghouse harmless for the four days which the contract had yet to run after the take-over. Consequently, there could be no claim against Gotham for failure to list that contract with respect to the "present operation" of the station. And, as we have found that the Bories' contract had in fact termi-

nated on July 31, 1962, it could have no effect on the "future operation" of the station. Consequently, there is no actionable breach for failure to list the Bories' contract in the schedule.

THIRD: Westinghouse seeks to hold Gotham liable for counsel fees because of the claimed breach of the indemnity agreement in the contract for the sale of the station, under which Gotham agreed "to indemnify and hold WBC (Westinghouse) harmless against * * * all liabilities, actions, suits * * * attorneys' fees and expenses of any kind * * * arising out of the operation of Stations or the ownership of the property * * * prior to the Closing Date or arising under any contract, agreement * * * assigned to WBC hereunder with respect to the performance of Gotham's obligations under said contract."

The only manner in which Westinghouse could have been held liable under the Bories agreement would be if it had expressly or impliedly assumed the obligation of that contract, and if it had been guilty of a wrongful breach thereof. Such wrongful act, if it were found on the part of Westinghouse, would not be encompassed within the terms of the indemnity clause, it not having arisen "out of the operation of [the station] prior to the Closing Date" but rather subsequent thereto, and not "with respect to the performance of Gotham's obligation under said contract". Consequently, Gotham had no obligation to defend the suit, charging Westinghouse with a breach of the Bories' contract, and therefore, could not be liable to Westinghouse for counsel fees in connection with the defense thereof. Therefore, that portion of the judgment in favor of Westinghouse and against Gotham for counsel fees and disbursements in defending the first cause of action asserted by Bories against Westinghouse must be reversed.

Accordingly, the judgment entered December 1, 1966 should be modified on the law and the facts by deleting those provisions granting judgment to the plaintiff against Westinghouse and Gotham on the first two causes of action, and substituting therefor a provision dismissing such causes of action, and by deleting the provisions granting Westinghouse judgment on its cross claims against Gotham for the amount it would be required to pay to the plaintiff on the first cause of action, and for counsel fees and disbursements in defending the first cause of action, and by substituting therefor a provision dismissing the cross claims above referred to, and as modified the judgment should be affirmed with costs and disbursements as against the plaintiff in favor of the defendant Westinghouse, and with costs and disbursements to the defendant Gotham as against the defendant

Westinghouse, and without costs as between plaintiff and Gotham.

STEVENS, J. P., STEUER, CAPOZZOLI and McGIVERN, JJ., concur.

Judgment unanimously modified, on the law and the facts, by deleting those provisions granting judgment to the plaintiff against Westinghouse and Gotham on the first two causes of action, and substituting therefor a provision dismissing such causes of action, and by deleting the provisions granting Westinghouse judgment on its cross claims against Gotham for the amount it would be required to pay to the plaintiff on the first cause of action, and for counsel fees and disbursements in defending the first cause of action, and by substituting therefor a provision dismissing the cross claims above referred to, and as so modified the judgment is affirmed with costs and disbursements as against the plaintiff in favor of the defendant Westinghouse, and with costs and disbursements to the defendant Gotham as against the defendant Westinghouse, and without costs as between plaintiff and Gotham.

Settle order on notice.